Just manage your own times as you choose. You need not ask for leave. Divide it as you wish and sit down when you wish. When the light turns red and the numbers are still changing, it doesn't mean you have that much time left. It means you're that much over time. At first case, Norid was continued because it stayed in bankruptcy. Likewise, Murr, Gumorthy v. Ashcroft will hear Travis v. Knappenberger. Counsel. Morning. May it please the Court, my name is Patty Risburger. I'm here on behalf of the plaintiffs, Suzanne Travis and Lisa Maddox. Could you speak up a little? The acoustics aren't that great in here. Certainly. Is the mic working or? Yes. It is. Okay. This case began because of Defendant Allen Knappenberger's failure to properly categorize his employees, legal assistants, as employees, instead he categorized them as independent contractors. He settled that part, though, right? Correct. That was settled. But the retaliation that occurred as a result occurred closely thereafter, after the filing of the complaint in March of 2000. Within 25 days, Suzanne Travis's employment was terminated. I thought she hung up on him and then didn't show up at work. That's true. Hung up is an interesting phrase, I think, too, and I'll talk about that. Doesn't it occur when you put the receiver back on the phone? Correct. And is that really a reason to terminate somebody, if they're not responding to you? They don't have a conversation. He just hangs up on you? Hanging up on your boss, you can get away with it? Well, it depends. If you're trying to tell your boss that you can't get a project done, that he's trying to dictate to you because you have to go and see your doctor, and he's refusing to even acknowledge that you are on the other side of the phone, then maybe you might start crying. And maybe if you're crying, the receiver is getting all wet and you have to put it down. I guess the problem is that we've got a jury verdict here, which essentially, I guess fairly construed, doesn't necessarily discredit your client's version, but found that the employer had a basis to terminate. I don't think we – I don't think that the termination issue got to the jury at all. The only issues that got to the jury were the retaliation. In fact, the judge even instructed the jury that the plaintiffs left of their own accord. That was part of the jury instruction. I don't know why that got in there, because it wasn't true. What happened was the summary judgment is what dealt with the termination claims, in particular of Suzanne Travis. And on summary judgment, we believe the judge erred in granting summary judgment in defendant's favor for the reason that the defendant offered three different reasons for the termination. Not one, not two, but three. Okay. Well, look, you have a pretty fair spread of time here to present your argument. Just to give you a little tip, we're all very familiar with the case. We've all read the briefs and the lower court opinion and thought about the case, though we don't pre-confer among each other. But just to let you know what would be helpful to me, you've raised an awful lot of issues on your appeal. It would be helpful to me if you would at least distinguish between your argument between when you're talking about the summary judgment issues, the issues that didn't go to the jury, and when you're making an argument about something that did go to the jury. Thank you. And I appreciate your point. For me, it would be helpful if you addressed the verdict. It's just when I see a – when I read a jury verdict, like on SER 181, usually that's all she wrote. And so it takes something pretty strong to get around it. I'll come back to that. I don't have it in front of me, Your Honor, so I'm not quite sure which – The issues didn't go to the jury. Your negligence claim and your claim of fraud were knocked out on summary judgment, correct?  Okay. Well, I don't think the jury verdict says anything about those. Correct. So I think on those, you have to explain why you think there was an issue of fact that should have been let you present it to the jury. On the other things that went to the jury, I have the same problem that Kleinfeld has as to whether, you know, you have any argument that we can address. Okay. I'd first like to address if it's all right in complying with your request that I deal with these not altogether. If we can just stick to the facts of Suzanne Travis's termination, which occurred on the summary judgment stage. We have a magistrate judge, of course, saying that summary judgment – denying summary judgment, and then the Article III judge saying hanging up the phone was one of the reasons. And so she set the events in motion that allowed – that resulted in the termination. I don't know if that's a legal conclusion or not, but it sounds awfully like one, but I'm not aware of case law to support it. And I don't think – Which claim are you talking about? You have two claims. Let's take the fraud claim, for example. As I understand the judge's ruling, he said, well, you've got a claim here on some other issues, but you don't have a fraud claim. Now, is there an issue of fact on fraud? Because I didn't see that this was a fraud case. You know, if you have – if you claim there was an issue of fact on a fraudulent misrepresentation of something, what is it? Why should that claim have gone to the jury? My recall of the briefs is that – and of the judge's ruling is what he focused on was the manipulation – or, excuse me, what he focused on in the fraud claim was that there was a legal – because this was a legal rather than a factual statement that was made that – You claimed it was fraud for him to treat these employees as independent contractors. And to represent to them that the Schedule Cs could be manipulated in such a manner that we can make this a, quote, win-win situation for both sides. What's the misstatement of fact that he made? That they were in fact – An opinion can't be the basis for a fraud claim. The statement of fact is that they were independent contractors rather than employees. The other statement of fact is that Schedule Cs can be manipulated in order to – in order to make somebody what they're not, in order to make them an – It can't be a statement of fact. I mean, you've got a 20-factor test, as I recall, for whether somebody is an independent contractor or an employee. And you've got Microsoft's famous independent contractors. I think it's a – It looks like it's – it's usually a statement of opinion. Well, I cited the Chin v. U.S. case at page 37 of the brief, and I think that indicates that it's primarily an issue of fact. It's a mixed question of fact and law, primarily one of fact. Okay. Maybe you could address your negligence claim that was knocked out on summary judgment. What was the negligence theory, and why did he toss that out, and why do you think he made a mistake? I'm not – You could reserve most of your time for the issues that went to the jury. I'm not prepared to argue the negligence claim at this time. Do you abandon that issue? No, I don't. I'd like some time in rebuttal. If that's – Do you rely on your briefs, then? I'd like to rely on the briefs and rebuttal. Do you want to turn to your trial issues? At trial, I think the main issue, one of the main issues was some testimony, in particular, John Thompson, the CPA. His testimony on emotion and limine was rejected. We wanted to introduce – this is at page 59 of the brief, and a plaintiff wanted John Thompson's testimony in, which was relevant to – directly relevant to Mr. Knappenberger's motive to retaliate. It established that he knew that the plaintiffs were employees, not independent contractors, that despite that knowledge and advice by his accountant, he continued to categorize them as independent contractors, and that he stood to gain financially from that. That's directly relevant to his motive to retaliate. None of that was allowed to come in. This was argued at the pretrial conference, which is the record at page – at 200 pages 10 through 15. It was highly prejudicial not to permit that type of testimony in. It established the causal length that was required between the protected activity and the adverse employment action. Also, the jury was instructed that mere hostility is insufficient to constitute an adverse employment action. Isn't that a correct statement of the law? Not in the context of this case. Maybe in some cases. This case may make new law, but what authority do you have that mere hostility is enough? We didn't say that in Ray v. Henderson. I think you cited cases in Ray v. Henderson, which strongly – Adverse employment action. That's – there's a huge difference between mere hostility in the workplace and an actual change in the circumstances of employment, adverse to the employee as a result of an impermissible reason. And if you've got a case that says merely a hostile working environment is enough, I'd like to hear the cite to it. I think that the Ray v. Henderson case cites cases which construe the adverse employment action standard very broadly. For example, the Weidman v. Walmart stores-in case, 11th Circuit, 141F3rd, at page 1456, includes making negative comments about the employee. Are you saying that if your employee sues you, you don't fire them, they still work for you? It's an adverse employment action that is actionable as retaliation if you don't like them as much? No, I'm not saying that. And I think you're getting into exactly the problem with the hostility term. It's a vague term. And if you – It seems to me it would be utterly ridiculous for the law to require the employer to like the employee as much as it requires something that's too contrary to human nature. I don't think any law in the world would require anybody to like anybody, Your Honor. I'm trying to see what else there is. Okay. What else there is? Just forget the cases from it. What did the employer do to make comments that you think is an adverse employment action? What did he do that you had evidence of that was – Prior to the lawsuit being filed, Mr. Knappenberger always treated Suzanne Travis with respect. After that, everything changed. He started throwing files at her. He would not let her work within her medical restrictions. He created insurmountable mounds of work with deadlines that could not be completed, couldn't possibly humanly be completed. He even slammed the phone down on her. That's in the record. He what? He slammed the phone down on her. He didn't hang up the – he slammed the phone down on her. Were these issues kind of just to the jury, right? You had a side of the story, he had a side of the story. Sure. To the jury. Sure, yes. How can we review that? I mean, what is there for us to review on this issue? The – at page 19 of the pretrial conference, Judge Bredin acknowledges that this case, the basis for this case was that there was hostility in the workplace, and that hostility escalated, and he used the word SOB. He said, now, what you have to show, Mr. Crispin, trial lawyer plaintiff, is that he was an SOB to begin with, and then he became an even worse SOB. He acknowledges that an increase in hostility is sufficient. So you get to the – what is the meaning of the term hostility? And if you look at Webster's, first definition is of or relating to an enemy. He let it go to the jury, though, right? Pardon me? This is like a jury argument. He let it go to the jury, didn't he? Whether there was some increase in hostile conduct. But by instructing the jury, by – he did, but by instructing – but the instruction given took it away, because the instruction says mere hostility. Wait. Direct me to the page of the excerpts that you're talking about for the instruction. I didn't read it as taking it away, and I may have misread it, so I want to be as clear I believe that it is – if I may step to the – away from you. I believe defense counsel was also kind enough to more easily point it out at page SER 203-8. One, two. Got it. Second paragraph. You're talking about this language. An adverse employment action is a non-trivial action by an employer that changes the terms and conditions of employment. Mere hostility of an employer to an employee does not constitute adverse employment action. Correct. What's the matter with that? Mere – in the context of this case, there's – what's the matter with it is that the term mere, precursing the term hostility, makes hostility out to be something much less than it is. That's why I asked you that question right at the outset of the discussion. Can it be actionable to like somebody less? And you conceded, no, that would be going a little far. That's what I understood the term mere hostility to mean. It's a fancy way of saying not liking somebody. But is that all that it means? It means also acts of warfare. At warfare – I've been watching warfare on television where they shoot each other. I think that's kind of a strong term. Hostility. I think the newscasters often refer to hostilities taking place in other countries. Ms. Risberger, I guess what bothers me is the first line that you read out of that Freedom from section – or excuse me, from page 1245 of 217F3rd, the Ray v. Henderson case, in which we said, Harassment is actionable only if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. And that is a correct statement of Ray v. Henderson as summarized in the instruction, is it not? True. Okay. However, the jury is left with the next sentence, that mere hostility does not constitute an adverse employment action. I don't – I think a reading of the term hostility is something that is just – I can't see anything wrong with it. Hostility means not liking somebody. And that's what it means. And merely not liking somebody isn't enough to constitute an adverse employment action, nor are non-trivial actions. Like, if he always got her flowers on Secretary's Day, and then he doesn't get her flowers on Secretary's Day anymore, I can't imagine you getting my vote to treat that as retaliatory action. Some of what you've described, like giving the secretaries more work than could be done in the time available to do it, gosh, I'm afraid I've been guilty of that with every set of law clerks I've ever had. And my clients have been guilty of it with me when I was in practice. And the Court is guilty of it with me now that I'm on the Court. But I don't think you've been – I don't get it, unless there's something a whole lot worse in concrete. I don't think you've been guilty of marked open antagonism. Okay. Well, let me ask this directed question in a slightly different way to you. You objected to this jury instruction that almost tracks literally the language of one of the Ninth Circuit cases that gives the standard. Did you have an alternate – first, I assume, but I want you to confirm, did you object to this instruction in the record? Yes. I believe it's the first argument in our reply brief. We quote where the – Not in your reply brief, but before the district court gave the instruction, you preserved this objection. Most definitely. Did you have an alternate instruction on this precise issue? In other words, if you thought this didn't fairly cover Ray v. Henderson and what our law was, did you give a proposed instruction? And where is that in the record? That I don't know, Your Honor. I believe that what Mr. Crispin in the reply brief argued, and it's confusing to me, but I believe what he argued was divorced of the terms and conditions language, that second sentence in the instruction that we're talking about isn't good enough because it isn't hooked to terms and conditions of employment. So that it makes it – it gives the jury this vague sense of just acting really mean to somebody and throwing files at them. I should say, like, mere hostility isn't enough unless it's so much hostility that it alters the terms and conditions of employment. Correct. Okay. But was there, like, a request that the instruction given in those words? Yes. I believe if you – I quoted the request. It's two or three pages at the very first point that's made in the reply brief. I think that it's pretty clear by the very end of that that that's what the request was. Okay. And I'll ask one more time. I think I know the answer, but do you have a case that supports the proposition the district court took language out of Ray v. Henderson and put it in that instruction? Is there another citation that you can give me that supports the language that you say you asked the district court to give? I think I heard your question. If I didn't, just please cut me off. But Wyatt v. City of Boston, 35F3rd, First Circuit, 1994, indicates toleration of harassment by other employees was considered. That's not hostility. Hostility means not liking somebody. Harassment means doing something to them. I don't believe that that definition is the one that I would use for hostility, Your Honor. I don't think a feeling. I'm sure you can think of people that you have felt hostile to, that you've never said a crossword to and never done anything bad to. I think certainly hostility can include non-acts, feelings and emotions. However, it also includes, by definition, anyway, according to Webster's, overt acts. Things like throwing files can be considered hostile acts. That is not just a feeling. That is not going to be mere hostility. That would be conduct. I think that could be considered by some people mere hostility, Your Honor. With all due respect, I do believe that. And I think the jury could have been left with that impression, that that's just merely being hostile. Gee, the files didn't hit her in the arm, hit her keyboard. He was just being hostile. He didn't decrease her pay. But that would be abusive conduct. I think hostility can also include abusive conduct. Okay. Do we have any other questions? Thank you, counsel. Thank you. Good morning. May it please the Court. My name is Paul Buchanan for Defendant Alan Knappenberger. I know the Court is familiar with the briefs. Excuse me. And there are a lot of issues that have been appealed. I think maybe the best use of my time is to respond to whatever questions you all may have on particular issues that have been appealed. It would be helpful to me. The case is a little sprawling. And it would be helpful to me if you would boil it down, give me a nice clean schematic of how you see it. Okay. Essentially, the case started out as a wage claim that was filed by four out of the six employees that were working in Mr. Knappenberger's law office at that time. Those claims were quite quickly resolved through an offer of judgment that was accepted. As soon as he went into another lawyer. That's essentially correct, Your Honor. Those were resolved, but the case quickly escalated, and the plaintiffs filed an amended complaint about two weeks later that included claims for retaliation, claims for intentional infliction of emotional distress, and various other claims that included in some instances some quite explosive allegations like that Mr. Knappenberger had thrown furniture at the plaintiffs, was in one of the complaints, that he had stolen client money, and that he had engaged in fraudulent billing practices. All of those three allegations that I just referenced were later acknowledged to be in error and were withdrawn. At the time, there was considerable press coverage going on about the case, so there was some concern about these allegations being picked up by the newspapers, and they were not actually withdrawn for a period of several months. So it was a tense situation, to say the least. What ultimately happened in terms of the plaintiff's employment was the first issue that arose was about three weeks after the filing of the complaint in regards to Suzanne Travis, the lead plaintiff. And in that instance, as you heard, she became agitated with Mr. Knappenberger over an issue of a medical appointment that she said she had. He was dictating correspondence to her over the telephone from his office. They were actually in the same office at the time. And she hung up the phone in anger when she felt he didn't adequately acknowledge her indication that she was going to go to this appointment. So she hung up the phone and she left the office. This was in the morning. They were that day filing an attorney's fees petition, which there was some stress around, I guess, to get the attorney's fees petition filed on time. So she left the office without saying anything. Mr. Knappenberger later discovered that she had left, wasn't sure whether she was coming back or not. That was in the morning. She never did return to the office. Did she leave a note or anything? I realize that she was pretty upset when she hung up on him. The evidence was that she went to see her or she telephoned her lawyer and she testified in deposition that her lawyer instructed her not to go back and that she left. Her lawyer then faxed a letter to Mr. Knappenberger's lawyer saying that she had left work that day because of the stress and that she wouldn't be coming back. Mr. Knappenberger testified that he didn't receive, he didn't find out about that letter that was sent to his lawyer until after he'd had the conversation with Ms. Travis the next day, in which he told her, you didn't show up, you left, I didn't know where you were, I'm going to construe that as your ending our business relationship. At the time, to sort of complicate the saga a little further, Mr. Knappenberger had found out and was concerned that she was, that Ms. Travis was going through some of his client files to try to find evidence to support her lawsuit, in particular, a legal memorandum that did, in fact, reference the difference between independent contractors and employees, which she was apparently attempting to find to show that he really knew the difference between independent contractors and employees. I read some suggestion in the plaintiff's briefing that that is sort of a, shall we say, a late-blooming theory for why he chose to terminate her. When in the litigation did that justification arrive? Well, it's undisputed, and Ms. Travis acknowledges that during his conversation that he had with her that next day when he said, this is ending our business relationship, that he told her at that time, I was planning on terminating your employment later this week anyway, based on your conduct in going through my client files and faxing out this client document that related to this issue. And did she acknowledge on deposition that he had said that to her? Yes, she did. Yes, she did, and that is in the record. So that ultimately didn't form the basis for the termination, but it would have shortly thereafter. So in any event, that resulted in the ending of Ms. Travis's employment. Then you have Ms. Maddox, who testified in her deposition, surprisingly in some respects given the allegations, that after the lawsuit was filed, Mr. Travis's or Mr. Knappenberger's conduct towards her improved dramatically and that he almost did a 180 in terms of his demeanor and attitude. Everybody acknowledged, including Mr. Knappenberger, that he is, you know, a tough old bird and a hard guy to work for, and that he had been at times explosive and difficult and had anger issues long before the lawsuit was filed. So the defense was there was no increase in hostility, because how would you know? In part it was, Your Honor, yes. The plaintiffs had represented in their intentional infliction of emotional distress claim that from the beginning of their employment, he had, and there was a laundry list of outrageous things that they said he had done. We did not acknowledge that he had done all those things, but we did acknowledge that he was difficult to work with from the very beginning and that they all were aware of that. It did become difficult for plaintiffs to assert at trial that this was any materially different given how they had portrayed it from the time that they started their employment there. So I guess one way the jury could have returned the verdict it did is it could have read the instructions and said there are a lot of adverse employment actions. He was a really unpleasant man, but none of them changed the terms and conditions of employment because he was that way right from the get-go, and it was not in response to any protected conduct by the plaintiffs. Yes, and that's, you know, very much the way that we argued the case to the jury, in fact. And so then you have Ms. Maddox saying that it seemed to her that he was restraining himself after the lawsuit, and she said, I just assumed he had to. At another point in her deposition, she said, I assume you told him that that's what he had to do. She's the one who said he was nicer there after the lawsuit than before? Yes, precisely. So for a period of about a year, their relationship dramatically improved. Then they had a big argument about 13 months after the lawsuit was filed. He had had a death in the family. She said he was in a bad mood. They had an argument over where some witnesses were supposed to be. They yelled at each other. She says that he swore at him. He denied that, or he didn't remember that in that particular instance, although he acknowledges he swore all the time. It doesn't matter if he swore all the time, right? Right. That's correct. In any event, Ms. Maddox left work that day, and she faxed a doctor's note saying that she would be out for 30 days. Mr. Knappenberger said, well, I have a – he wrote her a note, and this followed a period where she also didn't show up for one day of work without calling in and without an excuse. But she ultimately did drop off this doctor's note. He said, I've got a busy law practice. In a note, I'm going to get your job functions performed by somebody else. Her lawyer wrote a letter saying we construe that as a termination of employment. His lawyer wrote a letter back saying, no, it's not. And, in fact, she's free to request reinstatement after 30 days. She never did request reinstatement, and he never heard from her again. After about 35 days, he sent her a note saying, you haven't returned. I haven't heard from you. I'm going to assume that you voluntarily quit your position. Now, Ms. Maddox testified that she never became aware of this – of Mr. Knappenberger's lawyer's letter saying that her employment wasn't terminated. So Mr. Knappenberger didn't communicate with his lawyer and Ms. Travis didn't communicate with her lawyer. There was some evidence that looked that way, yes, Your Honor. In any event, so Ms. Maddox's employment ended in that fashion. So Maddox and Travis's retaliatory discharge claims were dismissed on summary judgment then, and the case went to trial on these retaliation claims for the retaliatory conduct that they alleged that had occurred up until the time that they left their employment. And on those claims that – Let me ask a question for you. Yes. Did the jury instruction make clear to the jury that if hostility was severe and pervasive enough to change conditions of employment, that that would be grounds for filing an adverse employment action? That's a good question, Your Honor. I don't know that that precise point was addressed in the instruction. I frankly can't recall at this point whether there was language like that included in the instruction. It was not a sexual harassment case, right? No. There was no actual claim of discrimination. It was all retaliatory actions that were alleged. And, you know, the way that the claim was presented to the jury by the plaintiffs was that this conduct was so severe that it altered the terms and conditions of their employment. And certainly under the instructions that they were given, a jury was free to find that that was the case. But this was – and I do believe there is language like that. I can't readily pinpoint it for you, unfortunately. I have a question. Did the – the appellant says that they – that appellants preserved objection to the jury instruction that has the language similar to Ray v. Henderson. Do you agree that they preserved that objection? You know, I don't agree with that, Your Honor. And I was just reading over that section from the trial transcript yesterday. And I will acknowledge that it's a very confusing colloquy that went on. On what record would we find whatever objection was made on the record to the particular instruction that's the centerpiece of the defendant's challenge? The easiest place to find it is they have set it forth at the very beginning of their reply brief with the cite to the supplemental – or to the excerpt of record, I think, that corresponds with it. But it is on the initial pages of their reply. There is about three pages of this colloquy back and forth. And, you know, my view is that to a somewhat surprising extent, it seems that plaintiff's counsel is agreeing both that there needs to be an adverse employment action and that simple hostility, mere hostility, however you want to phrase it, is not enough in itself. So it's difficult to tell from that apparent exception, if it was an exception, what precisely was being accepted to, at least I think. So it's your position there isn't a clear exception to the instruction that was given? That's correct, yes. And I think if the Court re-reads that section, likely come to a similar conclusion. There is no place in there where plaintiff clearly takes exception to the instruction that's given. There is discussion about what the appropriate standard is, but I don't see an exception that's made. What's your response to Ms. Risberger's citation to Wyatt v. City of Boston? I'm trying to recall what she cited that case for. I asked her if she had a case that would establish that a change in the, I'll call it, error of hostility is sufficient without more to alter conditions. I'm sorry to say that I don't recall what that case was. I think that's a case not from the Ninth Circuit. It's a First Circuit case, she said. Yeah. And I don't recall offhand. It wasn't a case that I noted that they made particular play out of in the briefs, and I didn't focus in on that. So I'll have to read it for myself. I'm afraid so, although I would be happy to address it if you would like. I'm sorry.  I think that you end up looking at the summary judgment on the termination claims, that we now have a jury verdict looking at that whole period of time before those people left their employment and finding that there was not retaliatory conduct during that time. I think, you know, it's an after-the-fact justification, and I don't really think that one is needed here because I think even on the record at summary judgment it was pretty clear that the plaintiffs themselves were responsible for the ending of their employment relationship. But now we also have, looking at this record as a whole, the benefit of a jury that has looked at Mr. Knappenberger's conduct during this whole period of time, and it's been placed in the most sinister cast that it possibly could be by plaintiff's counsel, and the jury said, no, we don't think that he was retaliating against any of these folks. And we have Ms. Maddox herself saying, actually, he seemed to do a 180 and seemed to be very restrained during this time and, you know, for months was much better behaved, really, than he had been before. We don't actually know. The jury could have thought he didn't act any worse than he did before. The jury could have thought he really didn't act that badly before or after. It's being exaggerated by the plaintiffs. Or they could have thought he always acted absolutely terribly, but it had no retaliatory aspect to it at all. He was that way before, during, and after. That's correct. But I think the one thing that we can do, that we can infer from the jury verdict is that Mr. Knappenberger did not do something with an intent to retaliate against these people, either to cause them to leave or just to cause them to suffer. I agree. That's the one thing that we can infer for sure. Yes. So unless there are other issues, I'm happy to rest on the briefs, but I'm also happy to answer any further questions. I don't. Okay. Thank you. Thank you, counsel. Travis V. Knappenberger is submitted. Next we'll hear from Travis.
judges: Kleinfeld, Gould, Tallman